[No. 57929-6.   En Banc.   May 20, 1993.]

*In the Matter of the Personal Restraint of*
HENRY GRISBY, JR., *Petitioner.*

*Alfred E. Kitching,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Theresa L. Fricke, Senior Prosecuting Attorney,* for respondent.

Andersen, C.J. —

## Facts of Case

Petitioner Henry Grisby, Jr., seeks review of a Court of Appeals' order dismissing his personal restraint petition. We granted Mr. Grisby's motion for discretionary review solely to address his claim that the sentencing scheme of the 1977 aggravated murder/death penalty law, former RCW 9A.32-.040-.047 and former RCW 10.94, is unconstitutional.

Grisby contends that the sentence imposed upon him under that law violated his Sixth Amendment rights by penalizing him for demanding a trial by jury. The former law, as interpreted by this court,[1] permitted a penalty of life in prison *without* possibility of parole to be imposed upon a defendant who, like Grisby, was found guilty of aggravated murder following a jury trial. The maximum sentence permitted for a defendant who entered a plea of guilty was life imprisonment *with* possibility of parole.

We affirm the dismissal of Mr. Grisby's petition on two grounds: First, because he has not demonstrated the actual and substantial prejudice necessary to sustain his personal restraint petition; and, second, because his petition fails on the merits.

The exceptionally brutal facts of the case before us are as follows.

On the morning of March 2, 1978, the petitioner herein, Henry Grisby, Jr., and his codefendant, Raymond Frazier, gunned down six people, killing five of them, including two young children aged 6 and 3.

The two defendants were charged and tried together under this State's 1977 murder/death penalty law,[2] which was in effect until 1981 when it was replaced by our present death

---

[1]*State v. Martin*, 94 Wn.2d 1, 614 P.2d 164 (1980); *State v. Frampton*, 95 Wn.2d 469, 627 P.2d 922 (1981).

[2]Former RCW 9A.32; former RCW 10.94; Laws of 1977, 1st Ex. Sess., ch. 206.

penalty law.[3] The State sought the death penalty against both defendants.

It is eminently clear from reading the trial court's instructions, and the argument of counsel at the penalty phase of the trial, that the jury, in deciding against the death penalty for Grisby and Frazier, was relying on "life without possibility of parole" as meaning just that. For example, at the penalty phase of the trial, the trial court instructed the jury as follows:

> MEMBERS OF THE JURY:
>
> Because you have found the defendants, Raymond Frazier and Henry Grisby, guilty of premeditated first degree murder, you have been reconvened for this Special Sentencing Proceeding to determine the sentence to be imposed in this case. At the conclusion of this proceeding you will be presented with four questions. Depending on your answers to these questions, the defendants will receive one of the following sentences:
>
> 1. Life imprisonment with the possibility of parole, or
> 2. Life imprisonment without the possibility of parole, or
> 3. The death penalty.

Penalty phase instruction 1 (part).[4] Then the jury instructions went on to explain:

> Life imprisonment without the possibility of release or parole means that the individual shall not have that sentence suspended, deferred, or commuted by any judicial officer, and a Board of Prison Terms and Paroles shall never parole the individual or reduce the period of confinement and the person shall not be released as a result of any type of good time calculation nor shall the Department of Social [and] Health Services permit the person to participate in any temporary release or furlough program.

Penalty phase instruction 3 (part).[5]

In his argument to the Grisby-Frazier penalty phase jury, counsel for Grisby's codefendant, Frazier, read the above

---

[3]*See* Laws of 1981, ch. 138.

[4]Trial transcript, Verbatim Report of Proceedings, at 2061; Trial Clerk's Papers, at 15.

[5]Trial transcript, Verbatim Report of Proceedings, at 2065; Trial Clerk's Papers, at 19.

definition of "life without possibility of parole" to the jury then eloquently argued as follows:[6]

> It means that every day and every night for the rest of his life, Raymond Frazier will be in prison, not at Campion Towers work release facility, not at Shelton, but in prison, at Walla Walla or some State institution.
>
> Never be released, never be paroled, never be furloughed, never be on a work release program.
>
> And unless you believe with all your heart and all your mind that that is what it means, then, your verdict is not a fair one.
>
> Unless you believe that when you are voting, when you are answering questions that would result in life imprisonment for Raymond Frazier, unless you believe for the purpose of the verdict that that is true, that he will in fact serve life in prison, then, the entire process becomes a farce.

At this trial, Grisby was convicted of five counts of murder in the first degree and one count of assault in the first degree. The trial court sentenced him to "life in prison without possibility of parole" on three of the murder counts and to life imprisonment (with possibility of parole) on two of the murder counts as well as on the count of assault in the first degree. The trial court specifically interlined in the judgment and sentence the language, "All sentences to be *consecutive*."

On appeal, this court examined all of Mr. Grisby's assignments of error and determined that he had been fairly charged, tried and convicted.[7] He now comes before us again, this time by personal restraint petition.

■ In the case of *In re Cook*, 114 Wn.2d 802, 792 P.2d 506 (1990), we made clear that the law governing personal restraint petitions required that

> in the context of constitutional error, *a petitioner must satisfy his threshold burden of demonstrating actual and substantial prejudice*. Unless a petitioner can make a prima facie showing of such prejudice, his petition will be dismissed.

(Citations omitted. Italics ours.) *Cook*, 114 Wn.2d at 810.

---

[6]Trial transcript, Verbatim Report of Proceedings, at 2101-02.

[7]*State v. Grisby*, 97 Wn.2d 493, 647 P.2d 6 (1982), *cert. denied sub nom. Frazier v. Washington*, 459 U.S. 1211 (1983).

The law is not that a petition "may" be dismissed if a petitioner does not make the requisite showing. It is that the petition "will" be dismissed.

 Mr. Grisby has offered *no* evidence, or even argument, to demonstrate any prejudice because of his sentence. In fact, no valid argument can be made on his behalf in this regard. There is no way he is ever going to be released on parole; therefore, he cannot satisfy his threshold burden of demonstrating actual and substantial prejudice.

As noted above, Mr. Grisby and his codefendant were convicted of shooting six people and killing five of them, two being very young children. Although on resentencing the Indeterminate Sentence Review Board would be required to set a minimum term on each count, the standard range sentence for any one of the murders appears to be 411 to 548 months.[8] Since the trial court set the maximum terms to run consecutively, the Board would "virtually ha[ve] the duty" to set consecutive minimum terms as well.[9] Consecutive *mid-range* sentences for the five murders would total nearly *200 years*. Additionally, even disregarding the trial court's recommendation, the execution-style murders of two defenseless young children is an aggravating factor that would justify either exceptionally long sentences for those counts, the setting of consecutive terms, or both.[10] If the Board set *just two* of the murder sentences at the high end of the standard range and ran them consecutively, Grisby would not be eligible for parole until the year 2039, even assuming he earns all possible good time credits. Nor could he be paroled even at that time (or at any time prior to the expiration of his *maximum* term) unless he is found to be rehabilitated and a fit subject for release.[11] Whatever this court's decision, Grisby

---

[8] RCW 9.94A.310 *et seq.*

[9] *In re Irwin*, 110 Wn.2d 175, 182, 751 P.2d 289 (1988) (the Board is required to exercise some discretion in this regard, however).

[10] RCW 9.94A.390(2)(b), .400; *State v. Batista*, 116 Wn.2d 777, 808 P.2d 1141 (1991).

[11] RCW 9.95.009(2); RCW 9.95.100.

will undoubtedly be in prison until he dies. Thus, any sentence on resentencing would be no more than the functional equivalent of life imprisonment without possibility of parole, the sentence he is presently serving.

Accordingly, since Mr. Grisby has not satisfied his threshold burden of demonstrating actual and substantial prejudice, his personal restraint petition is procedurally barred under Washington law and was properly dismissed by the Court of Appeals.

Because the Court of Appeals for the Ninth Circuit has held the sentencing scheme of this State's former death penalty law here challenged to be unconstitutional, we consider it necessary to go further and address Mr. Grisby's petition on the merits. We do this solely because this issue will recur and continue to cause a serious conflict between the decisions of this court and the Ninth Circuit.

In reviewing Grisby's constitutional claim, we emphasize that we are *not* in any way retreating from the rule requiring a showing of actual and substantial prejudice in collateral attacks on criminal convictions. This is a unique situation requiring clarification by this court.

The 1977 murder/death penalty law provided for three possible sentences: (1) life imprisonment *with* possibility of parole; or (2) life imprisonment *without* possibility of parole; or (3) the death penalty.[12] In *State v. Martin*, 94 Wn.2d 1, 614 P.2d 164 (1980), this court declared that under a court rule relating to pleas in criminal cases, a defendant had a right to escape the death penalty by pleading guilty to first degree murder and then receive a maximum sentence of life imprisonment *with* possibility of parole. Then the following year in *State v. Frampton*, 95 Wn.2d 469, 627 P.2d 922 (1981), this court ruled that since a person could avoid the death penalty by pleading guilty, the statute chilled the constitutional rights of a defendant who wanted to plead not guilty and have a jury trial in a death penalty case, thus violating the defendant's right to trial by jury. The death

---

[12]*See* former RCW 9A.32.040.

penalty portion of the statute was therefore declared unconstitutional in *Frampton*.

The provisions of the 1977 law authorizing life imprisonment without possibility of parole were left intact, however, and it is those provisions of the 1977 law which Grisby now argues are unconstitutional. This question was answered by the majority of the *Frampton* court when it *upheld* the constitutionality of the provisions of the statute which authorized life imprisonment without possibility of parole. In *Frampton*, a majority of this court agreed with then Justice Carolyn Dimmick's[13] separate opinion to that effect. Justice Dimmick wrote as follows:

> RCW 9A.32.047 provides that if this court holds the death penalty unconstitutional, "the penalty under RCW 9A.32.046 shall be imprisonment in the state penitentiary for life without possibility of release or parole." The severability provision, RCW 10.94.900, indicates this directive can stand alone although other parts of the statute are held invalid. Given the unambiguous manifestation of legislative intent present here, we must heed this directive unless it is constitutionally infirm.
>
> Is the present statutory scheme unconstitutional? I do not believe it is. The dispositive United States Supreme Court cases, *United States v. Jackson*, 390 U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968), and *Corbitt v. New Jersey*, 439 U.S. 212, 58 L. Ed. 2d 466, 99 S. Ct. 492 (1978), only prohibit a state from *impermissibly* inducing a defendant to plead guilty and to forego his right to a jury trial. To assess the constitutionality of the inducement present in this case we must determine whether a defendant who pleads guilty and is given a life sentence which carries a possibility of parole is treated sufficiently different from a defendant who goes to trial before a jury and is sentenced to life imprisonment without a possibility of parole. . . . [T]hese two penalties are substantially similar, and the present statutory scheme, therefore, does not impermissibly encourage a defendant to plead guilty.
>
> This court has clearly recognized that parole is granted strictly by grace through the Board of Prison Terms and Paroles. The discretion to grant or withhold this grace is virtually unfettered and unreviewable. *See State v. Fain*, 94 Wn.2d 387, 394-95, 617 P.2d 720 (1980); *In re George*, 90 Wn.2d 90, 94, 579 P.2d 354 (1978). Accordingly, a defendant who pleads guilty and receives a life sentence with a possibility of parole must expect he will

---

[13]Former Justice Dimmick of this court is now Judge Dimmick of the United States District Court for the Western District of Washington.

serve a *life sentence*. He will, in fact, serve the identical sentence as a defendant who exercised his right to trial by jury and was sentenced to life without possibility of parole; unless the State deigns to exercise its discretion and mollify his life sentence. Furthermore, a defendant who goes to trial and is sentenced to life without a possibility of parole is not "without hope," as the majority states. See majority opinion, at 484. The Governor may commute an inmate's sentence at any time free from legislative or judicial restraint. For example, the sentences of at least 12 convicted murderers were commuted in the last 4 years.

*The two penalties, while obviously not identical, are substantially similar. That is all the constitution requires.* Here, as in *Corbitt*, a defendant who pleads guilty and is sentenced to life with a possibility of parole is not substantially better off than a defendant who goes to trial and is sentenced to life without a possibility of parole. Under our statutory scheme, as under New Jersey's in *Corbitt*, a defendant who freely abandons his right to trial by jury may receive the same penalty as the defendant who makes the State prove his guilt at trial. Given this similarity of penalties, *Jackson*'s narrow prohibition against needless encouragement of guilty pleas, 390 U.S. 583, is clearly absent in this case.

(Footnote omitted. Last italics ours.) *Frampton*, 95 Wn.2d at 528-30 (Dimmick, J., concurring in part, dissenting in part (majority opinion on this issue)).

Mr. Grisby argues that the above quoted holding of *Frampton* is no longer sustainable. He relies on decisions of the Ninth Circuit Court of Appeals which held the life without parole portion of Washington's 1977 death penalty law unconstitutional.[14] The Ninth Circuit decisions upon which Mr. Grisby relies depend for their validity upon the language of *Solem v. Helm*, 463 U.S. 277, 77 L. Ed. 2d 637, 103 S. Ct. 3001 (1983), a case entirely inapposite to the case at bench. *Solem* only stands for the proposition that *under the facts of that very unique case*, a sentence of life imprisonment without possibility of parole was more severe than a life sentence with possibility of parole. By no stretch of the imagination does *Solem* stand for the proposition that *all* sentences of life im-

---

[14]*See Robtoy v. Kincheloe*, 871 F.2d 1478 (9th Cir. 1989), *cert. denied sub nom. Robtoy v. Callahan*, 494 U.S. 1031 (1990); *Norman v. Ducharme*, 871 F.2d 1483 (9th Cir. 1989), *cert. denied*, 494 U.S. 1031 (1990); *Marzano v. Kincheloe*, 915 F.2d 549 (9th Cir. 1990).

prisonment without possibility of parole are more severe than sentences of life imprisonment with possibility of parole.

Solem invokes the Eighth Amendment proscribing cruel and unusual punishment and holds that under that amendment "a criminal sentence must be proportionate to the crime for which the defendant has been convicted."[15] The majority opinion in *Solem* is very fact specific as to the sentence there before it for review. That opinion explores in great detail the nature of the crimes of one Jerry Helm, the petitioner therein. In this regard, the *Solem* majority opinion reads in part as follows:

> By 1975 the State of South Dakota had convicted respondent Jerry Helm of six nonviolent felonies. In 1964, 1966, and 1969 Helm was convicted of third-degree burglary. In 1972 he was convicted of obtaining money under false pretenses. In 1973 he was convicted of grand larceny. And in 1975 he was convicted of third-offense driving while intoxicated. The record contains no details about the circumstances of any of these offenses, except that they were all nonviolent, none was a crime against a person, and alcohol was a contributing factor in each case.
>
> In 1979 Helm was charged with uttering a "no account" check for $100. The only details we have of the crime are those given by Helm to the state trial court:
>
> " 'I was working in Sioux Falls, and got my check that day, was drinking and I ended up here in Rapid City with more money than I had when I started. I knew I'd done something I didn't know exactly what. If I would have known this, I would have picked the check up. I was drinking and didn't remember, stopped several places.' " *State* v. *Helm*, 287 N. W. 2d 497, 501 (S. D. 1980) (Henderson, J., dissenting) (quoting Helm).
>
> After offering this explanation, Helm pleaded guilty.
>
> Ordinarily the maximum punishment for uttering a "no account" check would have been five years' imprisonment in the state penitentiary and a $5,000 fine. See S. D. Comp. Laws Ann. § 22-6-1(6) (1967 ed., Supp. 1978) (now codified at S. D. Codified Laws § 22-6-1(7) (Supp. 1982)). As a result of his

---

[15]*Solem v. Helm*, 463 U.S. 277, 290, 77 L. Ed. 2d 637, 103 S. Ct. 3001 (1983). *Solem* is a 5-to-4 opinion in which Justices Burger, Rehnquist, White and O'Connor very vigorously dissented. *Solem* continues to be criticized by the United States Supreme Court. *Harmelin v. Michigan*, ___ U.S. ___, 115 L. Ed. 2d 836, 111 S. Ct. 2680, 2686 (1991) (wherein Justice Scalia declares bluntly: "*Solem* was simply wrong").

criminal record, however, Helm was subject to South Dakota's recidivist statute:

(Footnotes omitted.) *Solem*, 463 U.S. at 279-81.

The Supreme Court's majority opinion in *Solem* continues:

> *Helm's crime was "one of the most passive felonies a person could commit." State* v. *Helm*, 287 N. W. 2d, at 501 (Henderson, J., dissenting). *It involved neither violence nor threat of violence to any person. The $100 face value of Helm's "no account" check was not trivial, but neither was it a large amount. One hundred dollars was less than half the amount South Dakota required for a felonious theft. It is easy to see why such a crime is viewed by society as among the less serious offenses.* See Rossi[, Waite, Bose & Berk, *The Seriousness of Crimes: Normative Structure and Individual Differences*, 39 Am. Soc. Rev. 224,] 229[, (1974)].
>
> Helm, of course, was not charged simply with uttering a "no account" check, but also with being a habitual offender. And a State is justified in punishing a recidivist more severely than it punishes a first offender. *Helm's status, however, cannot be considered in the abstract. His prior offenses, although classified as felonies, were all relatively minor. All were nonviolent and none was a crime against a person.* Indeed, there was no minimum amount in either the burglary or the false pretenses statutes, see nn. 1 and 2, *supra*, and the minimum amount covered by the grand larceny statute was fairly small, see n. 3, *supra*.
>
> *Helm's present sentence is life imprisonment without possibility of parole.* Barring executive clemency, see *infra*, at 300-303, Helm will spend the rest of his life in the state penitentiary. *This sentence is far more severe than the life sentence we considered in Rummel* v. *Estelle*[, 445 U.S. 263, 63 L. Ed. 2d 382, 100 S. Ct. 1133 (1980)]. Rummel was likely to have been eligible for parole within 12 years of his initial confinement, a fact on which the Court relied heavily. See 445 U. S. at 280-281. Helm's sentence is the most severe punishment that the State could have imposed on any criminal for any crime. See n. 6, *supra*. Only capital punishment, a penalty not authorized in South Dakota when Helm was sentenced, exceeds it.

(Footnotes omitted. Some italics ours.) *Solem*, 463 U.S. at 296-97.

And finally, the majority opinion in *Solem* held as follows:

> *[Mr. Helm]* has been treated more harshly than he would have been in any other jurisdiction, with the possible exception of a single State. We conclude that *his sentence is significantly disproportionate to his crime*, and is therefore prohibited by the Eighth Amendment.

(Footnote omitted. Italics ours.) *Solem*, 463 U.S. at 303.

Even the most cursory reading of *Solem* shows that its references to the disparity of sentences of life with and without possibility of parole are limited to Jerry Helm's sentence.

In *Robtoy v. Kincheloe*, 871 F.2d 1478 (9th Cir. 1989), *cert. denied sub nom. Robtoy v. Callahan*, 494 U.S. 1031 (1990), a 3-judge panel of the Ninth Circuit Court of Appeals cited *Solem*, without discussion or analysis, for the proposition that the difference between life sentences with and without possibility of parole is *always* a significant one. The *Robtoy* court then held that the same portion of the statute, challenged here and upheld by this court in *State v. Frampton*, 95 Wn.2d 469, 627 P.2d 922 (1981), was thus unconstitutional under the reasoning of *United States v. Jackson*, 390 U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968). In a companion case to *Robtoy*, the same 3-judge panel of that court relied on *Robtoy*, not *Solem* specifically, to again hold that this State's sentence of life without parole for first degree aggravated murder was unconstitutional. *Norman v. Ducharme*, 871 F.2d 1483 (9th Cir. 1989), *cert. denied*, 494 U.S. 1031 (1990). Again in *Marzano v. Kincheloe*, 915 F.2d 549 (9th Cir. 1990), the Ninth Circuit Court of Appeals relied on *Robtoy* when stating that "Washington's statute imposing the sentence of life imprisonment without the possibility of parole [is] unconstitutional." *Marzano*, 915 F.2d at 552. While we always give careful consideration to Ninth Circuit decisions, we are not obligated to follow them, and do not do so in this case.

Furthermore, this court's later mention of the Ninth Circuit's holding in *Robtoy* in dictum in *State v. Bowerman*, 115 Wn.2d 794, 803, 802 P.2d 116 (1990) and *In re Moore*, 116 Wn.2d 30, 37, 803 P.2d 300 (1991) provides no basis for concluding that the Ninth Circuit's reading of *Solem* was correct. In our view, it was incorrect.

The case before us is not an Eighth Amendment case as is *Solem*. This is, rather, a Sixth Amendment case relating to a defendant's right to a jury trial.

*Solem v. Helm*, 463 U.S. 277, 77 L. Ed. 2d 637, 103 S. Ct. 3001 (1983) must be kept in perspective. *Nothing* in *Solem*

stands for the proposition that just because life without possibility of parole is considered more severe than life with possibility of parole in a case involving a Jerry Helm who commits nonviolent "less serious [property] offenses" (the Supreme Court's phrase) while under the influence of alcohol, applies equally to a convicted murderer of five people as is the petitioner here before us. We thus decline to overrule *Frampton* on this issue.

The Court of Appeals is affirmed; Mr. Grisby's petition was properly dismissed not only on the basis of state procedural bar, but also on the merits.

BRACHTENBACH, DURHAM, SMITH, and GUY, JJ., concur.

UTTER, J. (concurring in part, dissenting in part) — I agree with the majority that prejudice has not been shown by petitioner Grisby. I disagree, however, with the majority's disposition of the substantive issue. The majority fails to give effect to a clear line of federal cases.

The United States Court of Appeals for the Ninth Circuit has held the sentence of life imprisonment without the possibility of parole under the 1977 aggravated murder-death penalty statute unconstitutional. It has ordered defendants who, after a jury trial, were sentenced to life imprisonment without parole to be resentenced to life imprisonment with the possibility of parole. *See Robtoy v. Kincheloe*, 871 F.2d 1478 (9th Cir. 1989), *cert. denied sub nom. Robtoy v. Callahan*, 494 U.S. 1031, 108 L. Ed. 2d 619, 110 S. Ct. 1483 (1990); *Norman v. Ducharme*, 871 F.2d 1483 (9th Cir. 1989), *cert. denied*, 494 U.S. 1031, 108 L. Ed. 2d 619, 110 S. Ct. 1483 (1990). This court has approved that line of cases. *See In re Moore*, 116 Wn.2d 30, 37, 803 P.2d 300 (1991). In my view, we are bound by this case law interpreting the death penalty statutes, former RCW 10.94.010-.900; former RCW 9A.32.045, .046, .047 (repealed 1981).[16] Grisby could not have

---

[16]The statute in question, Washington's former death penalty statute, was enacted in 1977. Laws of 1977, 1st Ex. Sess., ch. 206. Due to constitutional defi-

received the sentence of life imprisonment without the possibility of parole had he decided to plead guilty. The statute therefore penalized the exercise of the constitutional right to a jury trial. *Compare* former RCW 9A.32.040(2) *with* former RCW 9A.32.040(3). *See Robtoy v. Kincheloe, supra; Norman v. Ducharme, supra; Marzano v. Kincheloe,* 915 F.2d 549 (9th Cir. 1990).

I would reverse the Court of Appeals, grant the petition, and remand to the trial court with instructions to resentence Grisby to life imprisonment with the possibility of parole.

JOHNSON, J., concurs with UTTER, J.

ciencies, the death penalty statute was rewritten and reenacted in 1981. *See* Laws of 1981, ch. 138. The current aggravated murder-death penalty statute is not challenged in this case.